COMMONWEALTH *vs.* ALBERT J. HENSON.

Suffolk.   March 2, 1970. — June 16, 1970.

Present: WILKINS, C.J., SPALDING, KIRK, REARDON, & QUIRICO, JJ.

*Assault.*

A verdict of guilty at the trial of a complaint for assault by means of a dangerous weapon, to wit: a revolver, was warranted by evidence that the defendant drew a revolver and pointed it at the victim, who thereupon thought he "was done for," and that the defendant fired several shots at the victim, notwithstanding the fact that the defendant's revolver was loaded only with blanks, where none of the persons present, except the defendant, knew that his revolver was so loaded until he was subdued after a running gun battle with the victim.

COMPLAINT received and sworn to in the Municipal Court of the West Roxbury District on December 26, 1968.

Upon appeal to the Superior Court the case was tried before *Coddaire,* J.

*William P. Homans, Jr.,* for the defendant.

*Thomas J. Mundy,* Assistant District Attorney (*J. Kevin Leary & Alvan Brody* with him), for the Commonwealth.

QUIRICO, J.   These are appeals under G. L. c. 278, §§ 33A–33G, from convictions on two complaints charging the defendant, respectively, with the crimes of assault on Theodore Finochio by means of a dangerous weapon, to wit: a revolver, and carrying a loaded revolver without a valid license so to do. In argument before this court and in his brief the defendant waived his appeal on the charge of carrying the revolver. The only issue before us is whether there was error in denying a motion by the defendant for a directed verdict on the complaint charging the crime of assault by means of a dangerous weapon.

The evidence would permit the jury to find the following facts. On December 24, 1968, Theodore Finochio, an off-duty police officer was at a gasoline station in Boston. He was not in uniform, but he had his service revolver in a holster under his coat. Another man and woman also were in the station at that time. The defendant and a female companion entered the station and the female used profane language. Finochio asked the defendant to keep the woman quiet. The defendant reached in his pocket, pulled out a revolver, aimed it at Finochio's stomach and said "Why should I?" Finochio put up his hands and said "No reason at all." He described his state of mind at that time by saying "I thought I was done for." The defendant then turned to go out of the station, holding the revolver at his side. Finochio took out his revolver, pointed it at the defendant and said, "Hold it there, buddy. I am a police officer." The defendant, who was then partially out of the door, turned and fired two shots at Finochio from a distance of about five feet. Finochio fired back and chased the defendant out to the street. They exchanged further shots in that chase which lasted about twenty to thirty seconds until the defendant was captured, subdued and handcuffed, and his revolver taken from his hand. The defendant fired a total of five or more shots, and Finochio fired six, one of which struck the defendant. Finochio was not struck by any projectile, and he received no injuries or powder burns in the incident. No projectiles were recovered at the scene. The defendant had taken the revolver from his female companion before going to the gasoline station. Before the shooting he noticed that it was loaded. He removed one shell from the cylinder and recognized it as a blank. He described the revolver as a "phony" gun or "play" gun.

The revolver used by the defendant was one made for the firing of .22 caliber blanks, also known as acorn blanks, which are shells without a bullet or projectile. Its revolving cylinder could be loaded with eight such blanks for firing. The revolver had been manufactured with a plug in the barrel,

but that plug had been bored out before it was used by the defendant. The size of the bore of the barrel at the muzzle was about .32 caliber, but it decreased to about .22 caliber as it went toward the cylinder. The hole which had been drilled through the plug inserted at manufacture was about the size of the lead in a pencil. After the drilling of this hole through the plug, the revolver could be used to fire a projectile in two ways. A very small projectile like a BB shot could be placed in one of the eight chambers of the revolving cylinder, with an acorn blank behind it, and when that chamber was aligned with the barrel the firing of the blank would cause the BB shot to be fired through the barrel. The second way would be to insert a projectile of not greater than .22 caliber size into the barrel from the muzzle end. Because of the very small hole drilled through the plug, the projectile could not go all the way back into the cylinder, but would remain in the barrel. The firing of a blank cartridge would then cause the projectile to be shot out of the barrel. An expert ballistician testifying for the prosecution described the second method as the only practical way of firing projectiles from the gun. Using this method, one could fire different projectiles from the revolver within seconds of each other.

On the evidence the jury could find that the defendant, without any legal justification, suddenly drew his revolver from his pocket, pointed it at Finochio's stomach in a threatening manner and thereafter fired it at Finochio five or more times. They could also find that the defendant intended to create, and did create, the impression on the persons present that he had a loaded revolver which was capable of shooting Finochio, and that until the defendant's running gun battle with Finochio was over and he was subdued, no one present except the defendant knew that the defendant's revolver was loaded with blanks. Finally, they could find that all persons present, except the defendant, reasonably believed that the defendant's revolver was loaded with live bullets which he was firing at Finochio.

It is at least relevant, even if not an essential element

of the crime charged, that "the objectively menacing conduct of the defendant, despite an actual inability to do harm, produced the fear of harm which it was intended to produce, with the same consequential tendency to provoke a breach of the peace as if he had the actual ability to do harm." *Commonwealth* v. *Slaney*, 345 Mass. 135, 140.

Despite this factual situation, the defendant contends that although he carried the revolver in violation of G. L. c. 269, § 10, as found by the jury, and used it against Finochio thereby committing an assault upon him, his conduct could not, and did not, constitute the aggravated offence of assault by means of a dangerous weapon since the shells in the revolver at the time were blanks. He equates his position to that of a person using a revolver which is capable of firing a bullet, but which is in fact not loaded, or to that of a person using a toy or imitation revolver which in fact cannot fire a bullet. Basically, he argues that because the revolver was not loaded with live ammunition, he did not have the ability to accomplish a battery by means of the revolver, and thus cannot be convicted of assault by means of the revolver.

This aggravated form of assault by means of a dangerous weapon was first made a crime in this Commonwealth by St. 1927, c. 187, § 1, enacting G. L. c. 265, § 15A. It had previously been held in *Commonwealth* v. *White*, 110 Mass. 407, decided in 1872, that the inability to commit a battery with an unloaded gun was no defence to a charge of simple assault. There, although the defendant was charged with a simple assault, the complaint included reference to a threat "to shoot with a gun . . . pointed and aimed at [the victim.]" The court said, at 409: "It is not the secret intent of the assaulting party, nor the undisclosed fact of his ability or inability to commit a battery, that is material; but what his conduct and the attending circumstances denote at the time to the party assaulted. If to him they indicate an attack, he is justified in resorting to defensive action. The same rule applies to the proof necessary to sustain a criminal complaint for an assault. It is the out-

ward demonstration that constitutes the mischief which is punished as a breach of the peace."

If this test were applied to the present case, the jury could find that the defendant's conduct and the attending circumstances indicated that the defendant was attacking Finochio by means of a loaded revolver. Thus the defendant's secret intent not to shoot Finochio based on his undisclosed inability to do so with the blank shells is not material. The defendant's acts, judged without the benefit of his secret knowledge that he was firing blanks, constituted a reasonably obvious case of an assault by means of a loaded revolver, involving a violent breach of the public order and setting in motion the normal reaction thereto by Finochio. The issue before us is whether this test should be applied to a case of assault by means of a dangerous weapon. Put another way, should the defendant now be allowed to avoid criminal responsibility for his conduct on the ground that he had only blank shells in his revolver, or that the revolver was only a "phony" gun or "play" gun?

We are aware of no prior decisions in this Commonwealth on the precise question involved in this case. Decisions on the offence of carrying a firearm without permission so to do are not helpful because by statute, G. L. c. 269, § 10, such act is an offence whether the firearm is "loaded or unloaded." Decisions on the offence of robbery "being armed with a dangerous weapon" are helpful but not conclusive because we have held that the gist of the offence is robbery, being armed, and not the use of the weapon. In such cases it is not necessary to show the use of the weapon in the robbery. G. L. c. 265, § 17. *Commonwealth* v. *Nickologines,* 322 Mass. 274, 277. *Commonwealth* v. *Chapman,* 345 Mass. 251, 255. For this reason we held, in the *Nickologines* case at 277, that there was no error in refusing to instruct the jury "that a pistol, revolver or other firearm is not a dangerous weapon unless it is loaded at the time it is used to commit . . . [the crime of robbery, being armed with a dangerous weapon]."

An examination of decisions on this question in other

jurisdictions shows a considerable conflict of authority, but it may be accurate to state that a majority of the jurisdictions which have spoken on the question have concluded that the crime of aggravated assault by means of a firearm, and in some cases the crime of simple assault is not made out by evidence of the pointing of an unloaded firearm. See Annotation, 79 A. L. R. 2d 1412. That applies whether the case is one where it was established that the firearm was not loaded at the time of the alleged assault, or one where there was no proof that the firearm was loaded. Many of these decisions turn on local legal provisions which do not prevail in this Commonwealth, and therefore they do not help us in this case.[1]

It is equally true that a number of decisions holding that one who menacingly points a firearm at another knowing it to be unloaded can be found guilty of assault by means of a dangerous weapon are based on local legal provisions which do not prevail in this Commonwealth or on factual situations different from ours.[2] However, in one

---

[1] (a) Some of the decisions are based upon the application of statutory or other definitions of assault which expressly require proof of a present ability to do harm or to accomplish the threatened battery as an element of the crime. *Chapman* v. *State,* 78 Ala. 463. *People* v. *Sylva,* 143 Cal. 62. *Klein* v. *State,* 9 Ind. App. 365. *People* v. *Wood,* 10 App. Div. 2d (N. Y.) 231. (b) Others are based upon the application of local laws requiring proof of a specific intent to commit an assault with a dangerous weapon, or to inflict bodily harm, with the result that if the assailant knew the firearm to be unloaded, he could not have the required specific intent. *People* v. *Katz,* 290 N. Y. 361, 365. *People* v. *Wood,* 10 App. Div. 2d (N. Y.) 231, 235. (c) Still others are based upon the application of statutes expressly requiring a specific intent, such as intent to kill or intent to murder, which cannot exist in one who knows the gun he is using is not loaded. *Marshall* v. *State,* 21 Ala. App. 500. *Meriwether* v. *State,* 104 Ga. 500. *State* v. *Mitchell,* 139 Iowa, 455. (d) Finally, some decisions are based on the application of statutes relating to assaults with "deadly weapons" which may mean something different from or more than the words "dangerous weapon" used in our statute. G. L. c. 265, § 15A. *Territory* v. *Gomez,* 14 Ariz. 139. *State* v. *Bush,* 50 Idaho, 166. *State* v. *Napper,* 6 Nev. 113.

[2] (a) Some of these decisions are based on statutes which make it a crime to carry or commit assaults with a "pistol, revolver . . . or other offensive or dangerous weapon" or similar words, and have concluded that a firearm is a dangerous weapon whether loaded or not. *State* v. *Ashland,* 259 Iowa, 728, 730. *State* v. *Atkinson,* 141 N. C. 734. (b) In some cases where there was no evidence that the firearm was loaded the court held that evidence of an assault by means of the firearm without more made out a prima facie case, or created a rebuttable presumption that the firearm was loaded, and that absent any evidence that it was unloaded it was sufficient to support the conviction.

jurisdiction, on facts similar to those before us, it has been decided without reliance on local statutory provisions that an unloaded gun is a dangerous weapon when the offence charged was assault "with a dangerous weapon, to wit: a revolver." *State* v. *Johnston,* 207 La. 162, 164.

Our answer to the question before us would seem to depend on whether, under the law of this Commonwealth, proof of a charge of the crime of simple assault or of aggravated assault requires proof of the present ability to accomplish the battery which is threatened or attempted in the assault. As we have indicated above, it was held as to simple assault that "[i]t is not the secret intent of the assaulting party, nor the undisclosed fact of his ability or inability to commit a battery, that is material; but what his conduct and the attending circumstances denote at the time to the party assaulted. . . . It is the outward demonstration that constitutes the mischief which is punished as a breach of the peace." *Commonwealth* v. *White,* 110 Mass. 407, 409. That language has been quoted and the decision cited on many occasions in the discussion of "apparent" ability to commit the battery threatened or attempted. In Perkins on Criminal Law (1957) 91, the author poses the questions: "If one has tried to apply force to the person of another unlawfully, or has made a menacing gesture causing apprehension thereof, what will be the effect of proof that at the moment he did not have the actual ability to do what he tried or offered to do? . . . Suppose there is apparent ability but not actual ability; suppose it is apparent to one but not to the other; will it make any difference?" He then answers the questions by writing further, at 91–93: "Where an assault may be committed either by an attempt to commit a battery or by an unlawful act placing the other in reasonable apprehension of receiving an immediate battery, it is clear that *apparent* ability will suffice. . . . There must

*State* v. *Herron,* 12 Mont. 230, 235. *State* v. *Lewis,* 186 N. E. 2d, 487. (c) Some of these decisions noted, in upholding the convictions, that the unloaded firearm was used or could have been used as a bludgeon and thus was a dangerous weapon. *People* v. *Egan,* 77 Cal. App. 279, 284. *People* v. *White,* 115 Cal. App. 2d 828, 832.

be some power, actual or apparent, of doing bodily harm but apparent power is sufficient. . . . Hence in jurisdictions giving full scope to the modern rule of criminal assault, this offense may be committed where the battery itself is actually impossible, if it reasonably seems possible either to the assailant or to his victim; . . . and the assailant could place the other in apprehension of an immediate battery by means that appeared to be effective although the assailant himself knew otherwise. . . . In jurisdictions giving full scope to the modern rule of criminal assault it is possible to commit this offense by pointing an unloaded weapon at another within normal range." The author cites *Commonwealth* v. *White, supra,* as well as many other decisions as the basis for his statements on the doctrine of "apparent ability."[3]

The fundamental reason for permitting a conviction for simple assault on proof of apparent ability of the assailant to accomplish the attempted or threatened battery is that the public peace and order is affected by and dependent upon what is reasonably apparent, and not upon secret fact or reason rendering the assailant incapable of accomplishing the battery. The reason applies with even greater force to a case of apparent ability to accomplish a battery attempted or threatened by means of a firearm. The threat to the public peace and order is greater, and natural reactions thereto by the intended victim and others may be more sudden and violent than in cases where no weapon is involved. There is no reason why the rule of apparent ability should not apply to charges of aggravated assaults by means of weapons. It is sufficient to prove such a charge if the evidence shows an apparent ability to accomplish the battery by means of the particular weapon used. Thus, the mere fact that a firearm brandished by an assailant is known by him to be unloaded, or to be loaded

---

[3] Convictions for simple assault were upheld in the following cases involving unloaded firearms. *Price* v. *United States,* 156 F. 950 (9th Cir.). *State* v. *Shepard,* 10 Iowa, 126. *State* v. *Archer,* 8 Kans. App. 737. *People* v. *Wood,* 10 App. Div. 2d (N. Y.) 231. *State* v. *Deso,* 110 Vt. 1. *State* v. *Shaffer,* 120 Wash. 345.

with blank cartridges, does not entitle him to an acquittal on a charge of the aggravated offence of assault by means of a dangerous weapon.

*Judgments affirmed.*